Christian, J.
The indictment in this case is founded upon the 49th section of chap. 192 of the Code, which is in the following words: “ If a person obtain by any false pretence or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of the larceny thereof.”
The indictment contained but one count, which is a simple count for larceny ; and charges that “William J. Anable, on the 27th day of March, in the year one thousand ■eight hundred and seventy-two, at the said city.(of Richmond), and within the jurisdiction of the Hustings court ■of the city of Richmond, a certain check, the same being an order to the Planters Rational Bank, dated Richmond, March 27th, 1872, for the payment of three hundred ■dollars to E. B. Hewburu or order, and endorsed Edward B. Hewburn, and of the value of three hundred dollars, *566 signed by one J. H. White, the maker thereof, the said check, at the time of committing the felony aforesaid, being the property of said J. H. White, and the said sum of three hundred dollars, payable and secured by and upon the said check, being due and unsatisfied to the said J. H. White, the proprietor thereof, feloniously did steal, take and carry away, against the peace and dignity of the commonwealth of Virginia.”
As to the question so elaborately and ably argued by the prisoner’s counsel, that the statute declaring that a party who obtains money or other property, the subject of larceny, “shall be deemed guilty of the larceny thereof,” should be construed as fixing the punishment of the offence, and not as changing the mode of proceeding or the form of the indictment, it is sufficient to remark, that whatever may be the view of this court upon that question, as an original proposition, it cannot now be reopened, and must be considered as res adjudicata.
The principle settled in Dowdy’s case, 9 Gratt. 727, followed in Leftwich’s case, 20 Gratt. 716, and recently in Pierce’s case, 21 Gratt. 846, have fixed the judicial interpretation of the statute. That interpretation, accepted and acted upon by the profession since the year 1852, and the Legislature, with full knowledge of this judicial, interpretation, never having amended the statute, it would be mischievous to the last degree now to change-it; and the rule stare decisis must now prevail. It must, therefore, be now held as the settled law of this State, that upon an indictment simply charging larceny, the commonwealth may now show either that the subject of the lai’ceny was received with a knowledge that it was-stolen, or that it was obtained by a false token or false pretence.
This is sufficient to dispose of one of the grounds of' error assigned and much relied on by the prisoner’s- *567 counsel. The other assignments of error require more particular consideration.
First. The refusal of the court to give the first tion asked for by the prisoner’s counsel.
That instruction is as follows: “ If the jury believe from the evidence, that the prisoner had sums of money audited and allowed him by the board of supervisors of Henrico county, sufficient to pay all existing legal warrants drawn by him in his own favor, and passed to and owned by other parties, which have been registered on the books of the treasurer of the county before the warrants said to have been gold to Hr. "White, and also to pay the warrants of Hr. White, then they must acquit the prisoner.”
I am of opinion that this instruction ought to have been given. This instruction asserts the proposition, that the prisoner could not be found guilty of obtaining the check of Hr. White by false pretences, if at the time the warrant was sold to him the prisoner had funds audited and allowed him by the board of supervisors sufficient to pay this warrant and all others which had been drawn by him and registered upon the books of the treasurer of the county.
Flow, while the statute declares that a party obtaining money or other thing of value by false pretences “shall be deemed guilty of the larceny thereof,” it is manifest that he cannot be found guilty under a simple count charging him with larceny, any more than under one charging specifically the offence of obtaining money or other property by false pretences, if there is wanting in the proof any of those elements which constitute that offence. To constitute the offence described in the statute four things must concur:
1. There must be an intent to defraud;
2. There must be an actual fraud committed;
*568 3. False pretences must be used for the purpose of perpetrating the fraud; aud
4. The fraud must be accomplished by means of the false pretences made use of for the purpose; that is, they must be in some degree the cause, if not the controlling and decisive cause, which induced the owner to part with his property.
If any of these essential elements are wanting, the offence is not made out. But especially is the gravamen of the offence that the pretences are false; and if the prisoner can show that the representations upon which he obtained the property from the owner are true he cannot be convicted; and certainly all testimony tending to show that fact is proper to be considered by the jury.
If the hypothetical case put in the instruction offered by the prisoner’s counsel, could be made out by the proof (and of this the jury must be the sole judges), then the representations made by the prisoner, in offering the warrant for sale, that he had allowed and audited in his favor a sufficient fund to meet this warrant was true and not a false pretence.
It is a well-settled rule, established by repeated decisions of this court, that if there is any evidence before a jury tending to prove a case supposed in au instruction asked for, and the instruction propounds the law correctly, it should be given. In Hopkins Brothers v. Richardson, 9 Gratt., 496, Lee, J., delivering the opinion of the court, said: “ In a plain case of the total absence of evidence tending to make out the supposed case, the court may well refuse to give any instruction based upon it. But where there is such evidence, of however little weight it may appear to be to the court, or however inadequate in its opinion to make out the case supposed, it is best aud safest for the court not to refuse to give the instruction asked for if it propound the law correctly.”
*569 And. so also in Farish & Co. v. Reigle, 11 Graft. 719, It was held, that if there be any relevant and competent testimony, however slight, tending to prove the case supposed in the instruction, the party asking for it is entitled to have the law in that particular hypothetically expounded to the jury. There was in this case evidence strongly tending to prove the supposed facts stated in this instruction. The refusal of the court to give it might well have, and did have, the effect of bringing the minds of the jury to the conclusion that the prisoner might be convicted of obtaining the check from Dr. "White under false pretences, although he could show that at the time the warrant was sold to him it was a valid and legal warrant, drawn upon a fund ample for its re•demption. In other words, the effect of such refusal was to cut off from the consideration of the jury evidence tending to negative the false pretence and the intent to defraud, which are the two essential elements constituting the offence charged.
The objection taken to the instruction iu this court is, that it is limited to those warrants which had been registered on the books of the treasurer; while the evidence shows that there were a number of warrants sold by the prisoner which were not registered; and that, taking all the warrants, registered and unregistered, the prisoner had disposed of warrants to an amount largely exceeding the fund to his credit, due from the county of Henrico; and that therefore it was plain that the prisoner had obtained money upon some of these warrants by falsely representing that he had funds to his credit to meet them, •when in fact he had largely overdrawn on that fund.
That the prisoner had largely overdrawn on the fund -due him is abundantly shown; and that somebody had been defrauded by him, upon a false pretence, is equally clear. But the question is not whether he has cheated *570 somebody; whether he has obtained money, or other property of value, by false pretences, from somebody; but the question is, did he cheat Dr. White? Did he obtain the check (which is charged as the subject of the larceny) from Dr. White upon any “false token or false pretence?”
It was this question which was submitted to the jury in the first instruction, and they were in effect asked to-be instructed that if the facts therein stated were true, there w^as no false pretence, and they must acquit the prisoner. In other words, the proposition submitted was simply this, that if the jury should find that at the time the warrant was sold to White the prisoner had to his credit funds sufficient to pay all outstanding warrants drawn in his favor and registered on the books of the treasurer of the county of Henrico, and also to pay the-warrants sold to White, then there was no false pretence,, and the prisoner could not be found guilty.
This was not an abstract proposition, but there was-evidence strongly tending to support the hypothetical case stated. This evidence I propose now briefly to notice. It is important, however, first to refer to the act of assembly prescribing the mode of auditing, and registration and payment of warrants upon the county treasurers. It is sufficient for the purposes of this case to note the 10th and 11th sections of chapter 170, Sess. Acts, 1871-2, which are as follows:
“ § 10. He (the treasurer) shall keep a well-bound book in which he shall make an entry of all warrants or orders legally drawn upon him by the County or Circuit court, or the board of supervisors for the county, and presented for payment, stating correctly the date, amount, number, in whose favor drawn, and the date the same-was presented; and all warrants or orders so presented *571 shall be paid in the order presented, out of the fund drawn upon.
“ § 11. Ho county treasurer shall refuse the payment of any warrant or order legally drawn upoD him and presented for payment, for the reason that warrants or orders of prior presentation have not been paid, when there shall be money in the treasury belonging to the fund drawn upon sufficient to pay such prior warrants or orders, and also such warrants or orders so presented; but such treasurer shall, as he shall receive money into the treasury belonging to the fund so drawn'upon, set the same apart for the payment of warrants or orders previously so presented, and in the order so presented,” &c.
It will thus be seen that all warrants or orders on the county treasury are to be registered according to the date of their presentation, and to be paid in the. order presented. Let us now look to the evidence certified by the court below. It is proved that in Mai’ch 1872 there was due to the prisoner from the county of Henrico the sum of $1,649, the sum of $225 being the balance due him from the levy of 1871, and the sum of $1,424 being due him out of the levy of 1872. It is further proved that on the 16 th day of March 1872, which is the date of the warrant sold to White, (which the court certifies to be the same warrant for which the check, the subject of the larceny charged ■was giveu,) there stood upon the treasurer’s books wai’rants registered and drawn in favor of tbe prisoner amounting to the sum of $1,664. Hut- of this amount, two warrants, drawn in favor of J. A. Smith for $350 each, were delivered to Smith, according to Smith’s own statement, as collateral security for a note of about $500, ,not due until April 1872, upon the agreement that Smith would return the warrants whenever prisoner would satisfy the note when it became due. As part also of this aggregate of the amount of warrants regis *572 tered, is a warrant drawn in favor of L. R. Spilman for $350, for which Spilman declined to advance the money after it had been registered in his favor. Therefore, in computing the amount of registered warrants on the treasury of Henrico county, this warrant in favor of Spilman must, of course, be deducted, as the money was never paid for it, and he, Spilman, does not claim it. As to the warrants in favor of Smith for $700, being delivered only as collateral security for a note of $500, there was left of this amount $200, which the prisoner had a perfect right to estimate as a part of the fund due him from the county of Henrico, and which he might well appropriate to other creditors. How, deducting the warrant sold to Spilman and registered in his name, which is conceded on all hands he never paid for and does not claim, and deducting $200 from the warrants delivered to Smith as collateral security, we have this state of facts: that there was due to the prisoner from the county of Henrico, on the 16th March 1872 the sum of $1,649, and the registered warrants for which he was bouud, making the deductions to which he was plainly (as shown above) entitled, amounted to the sum of $1,114, leaving a balance in his favor, actually due him, or certainly what, according to the act of assembly, was the balance in his favor, looking to the registered warrants, of the sum of $535. So that it appears that when Hr. White had his warrant registered there was in point of fact funds amply sufficient to pay Hr. White the amount of the warrant sold to him, and all the other warrants registered before his was presented, the rule of law being that the warrants must be paid in the order presented.
The evidence further shows that White did not act alone upon the representations made by the prisoner or his agent. He did not purchase the warrant until he *573 had consulted with the county judge, the sheriff and the treasurer. They all informed him that the warrant was all right and would certainly be paid. It must be presumed that these officers knew the law, and that the treasurer especially knew what amount was standing to the credit of the prisoner, and what amount had been registered of the warrants sold by him. He knew that warrants must be paid in the order they were presented, and he looking, as we are bound to presume, to the amount of warrants registered, and knowing, as we are also bound to presume, the amount levied in favor of the prisoner, said the warrant was perfectly good, and would certainly be paid.
I am constrained to say that upon this review of the evidence, the hypothetical case stated in the instruction refused, was strongly supported by the facts proved, and ought to have been given. I repeat, it is uo answer to this view to say that the evidence shows that other warrants, not registered, were sold by the prisoner, and that he overdrew largely upon the fund credited to him. This is all true. He did obtain money under, false pretences from some of the parties to whom he sold warrants which wrere not registered before Hr. White’s; but it must be constantly borne in mind that the specific charge against the prisoner was, that he “ did steal, take and carry away,” a certain eheeh, the property of Dr. White; and the question is, did he obtain that check upon false pretences. If the hypothetical case stated in the instruction be true, he certainly did not; and it was clearly for the jury to decide whether the supposed facts were sustained by the proofs in the cause or not. The refusal of the court to give the instruction asked for was in effect to prevent the jury from considering testimony 'which tended to negative the false pretence and the intent to defraud. And the case presents the strange anomaly that the prisoner *574 may be sent to the penitentiary for cheating and defrauding Dr. White, when in point of fact Dr. White may not lose a dollar, but may yet receive from the treasury of Henrico county the whole amount of the warrant sold to him by the prisoner; for the proof is clear that there still remains in the hands of the treasurer the sum of sixteen hundred and forty-nine dollars due to the prisoner, and subject to the warrants sold by him, and which, under the law, are to be paid in the order in which they are registered. If Dr. White’s warrant should be so paid he is not defrauded, and the prisoner is guilty of no false pretence. I am therefore of opinion that the Hustings court erred in refusing to give the first instruction asked for by the prisoner’s counsel.
I am further of opinion that there was no error in the • refusal of the Hustings court to give the 5th and 6th instructions asked by the prisoner’s counsel, nor in giving, the 3rd instruction with the addendum made by the court.
I am therefore of opinion, for the reasons above given, as to the said court refusing the 1st instruction, that the judgment of the Husting court be reversed and annulled, and that the prisoner be remanded to said Hustings court, for a new trial; at which trial the said first instruction,, or one similar thereto, if asked, shall be given by said •court.
Moncure, P. I am so unfortunate as to differ from .all my brethren in this case in the result at which they have arrived, and I will proceed to deliver my own opinion on the different questions arising in the case.
The most important question in this case, and the one most discussed by the learned counsel for the plaintiff in error, arises on the second and last bill of exceptions to the opinion of the court overruling the motion for a *575 a new trial, and will be first considered by me. It is whether an indictment for larceny can be maintained by evidence of obtaining the article alleged to have been stolen by false pretences.
The affirmative of the question has, in effect, been three times unanimously affirmed by this court: first in Dowdy's case, 9 Gratt., 727, 734, decided in 1852; secondly, in Leftwich’s case, 20 id., 716, 719, decided in 1870; and thirdly, in Price’s case, 21 id., 846, 850. In the first of these cases the offence was receiving stolen property, knowing it to have been stolen. In the second the offence was obtaining property by false pretences, and with intent to defraud; and in the third the offence was, as in the first, receiving stolen property, knowing it to have been stolen. In regard to both of these offences, and also in regard to the offence of embezzlement of property by officers, carriers and other bailees, the statute uses identically the same language, and declares that he who shall receive or obtain, or convert to his own use by such means the property of another, “shall be deemed guilty of larceny thereof.” Code, ch. 192, §§ 20, 21, 22 and 49. It is manifest that this same language used in each of these sections was used in the same sense, and must receive the same construction.
One would suppose that after these repeated affirmations ty the unanimous opinion of this court, the question would be considered as settled, whether rightly or wrongly, and as alterable only by an act of the legislature. But the counsel for the plaintiff in error contended that all these unanimous affirmations by this court were but obiter dicta, not necessary to the decision of the cases in which they were made, and that therefore they were not binding authority; that the question has never, in fact, been decided bjT this court, and is now a new question.
*576 It is true that in none of these cases was the decision of the question necessary to the decision of the cases themselves. But it is also true, that in none of them ought the court to have made such an affirmation unadvisedly or without consideration; and the presumption is, that the court did not do so in any of them. A decision of this court is not conclusive, except in the case in which it is pronounced. It is a binding authority in, other cases until reversed or modified by the court itself. A mere obiter dictum is not a binding authority, because it is generally a casual remark, dropped in theeourse of ajudicial opinion, in reference only to the case before the court, and without considering its general meaning and operation. But when it appears to have been proper that the court should express its opinion upon a question arising incidentally before it, and for the purpose of settling the practice in eases like the one before it, certainly it was the duty of the court to consider the question very carefully, and the presumption is that it did so. Such an expression of opinion is entitled to great weight, and comes nearly up to the degree of a binding authority, especially where it has been three times repeated, and every time by theAourt unanimously. Such an expression of opinion ought to be considered as settling the true construction of a statute and the proper practice under it.
The course of legislation under which this question arises was substantially commenced by the legislature of 1847-8, in whose act, commonly called the criminal code, the provisions before referred to, or most of them, were substantially embodied. They were afterwards copied, with some extension and verbal alteration, into the Code of 1849. Hot long after the enactment of that code, to wit: in July 1852, Dowdy's case came before this court for decision; and the occasion seemed to the court *577 to be a very proper one for declaring the true construetion of these provisions, and the proper practice under them. The offence in that case, as before stated, receiving stolen property, knowing it to be stolen; and there were thirteen counts in the indictment! The court said: “ In the case under consideration the counts of the indictment are all for the same offence, to wit: the larceny of * eleven hundred and forty pounds of tobacco, of the value of one hundred dollars;’ and they differ from each other only in the statement of names and other incidental circumstances. The statute under which all of them but the first was framed, declares that a person knowingly receiving or aiding in concealing stolen goods, shall be deemed guilty of the larceny thereof. The common counts for larceny would alone have been sufficient in this case; and by relying solely on them the great length of the indictment would have been avoided. It would then have contained but three instead of ten counts; that is, for the larceny of the goods and chattels — first, of Uathaniel M. Osborne; second, of George McGlasson; and thirdly,,of a person unknown.” One of the objects of the statute was to shorten indictments; but this court saw that the practical effect of it was greatly to lengthen them. And, therefore, the court in Dowdy's case deemed it fit to declare the true meaning of the statute, in ordér that the practice might conform thereto. In LeftwicKs case the offence was, obtaining ninety dollars in United States currency by false pretences and with intent to defraud; being an offence created by the Code, eh. 192, § 49. The indictment contained three counts, in each of which the offence was set out specially, and not in general terms as in the case of a larceny at common law, except that to the third count there was a conclusion, that so the accused, the said ninety dollars “feloniously did steal, take and *578 away,” &c. There was a motion to quash the first and second counts, which was overruled. This court said: “ in regard to the motion to quash the first and second counts, it is contended that they ought to have been quashed, because they are not in form as for larceny at common law, and do not allege the stealing, taking and carrying away of the subject of the larceny. It would certainly have been competent for the pleader to have counted as for a larceny of the subject, in the form of an indictment for larceny at common law; and proof of the special facts set out in the act as constituting the of-fence w'ould have sustained the charge.” Dowdy v. Commonwealth, 9 Gratt. 727, 734. But it is also competent for the pleader, instead of counting for a larceny of the subject, in the form of an indictment for larceny at common law, to charge the specific facts which the act declares shall be deemed larceny. The legal conclusion deducible from these facts is drawn by the act itself, and need not, of necessity, be drawn in the indictment. In Price’s case the offence was receiving stolen property, knowing it to have been stolen. The indictment contained four counts. The first three charged the offence specially and in different forms, as receiving a stolen horse, knowing it to have been stolen. The fourth simply charged the larceny of a horse, in the common form. This court said: “ This last count would have been sufficient of itself, without the insertion of the others in the indictment. The law declares,” &c. (as in the Code, p. 789, § 20): “ If a person be indicted for the simple larceny of a thiug, and the proof be that it was stolen by some other person and received by the accused knowing it to have been stolen, the proof will sustain the charge; because, having received stolen property knowing it to have been stolen, he is bylaw ‘deemed guilty of larceny thereof',’ and may be prosecuted as if he had himself *579 been tlie actual thief. Still, the pleader may, if he choose, charge him specially as the receiver, and may insert several counts in the indictment, charging the of-fence in both forms, as was done in this case. But, as a count for simple larceny would be sustained by the proof, whether it was that the accused actually stole the thing, or that he received it, knowing it to have been stolen, and as simplicity and brevity in pleading, especially in criminal cases, is desirable, the better practice would seem to be to count in such cases as for simple larceny only.”
Such has not only been the repeated and uniform construction of these provisions of the law, which are not only in pari materia, but are contained in the same chapter of the Code, and are expressed, so far as the question under consideration is concerned, in identically the same language; but it seems to me to be their plain and necessary meaning. This language in all of them is: “he •shall be deemed guilty of larceny thereof;” that is, larceny of the goods so received, or so embezzled, or so •obtained under false pretences. Eow, what is the definition of larceny? “The felonious stealing, taking and carrying away of the goods of another.” Suppose these provisions, instead of saying “shall be deemed guilty of •the larceny thereof,” had used the definition of larceny: had said “he shall be deemed guilty of ‘feloniously stealing, taking and carrying away the goods ” so received, or so embezzled, or so obtained by false pretences,” could there have been a doubt but that the accused might have been charged in the indictment with a larceny of the goods in the common form? And is there any conceivable difference in meaning between these two forms of expression? I think not.
This construction is confirmed by the manifest objects of these provisions, according to my understanding of *580 them. One of these objects, to wit: to promote simplicity and brevity in pleading in criminal cases, was referred to in Price’s case. Hut that was a minor object compared to another and the chief object, which was to prevent the acquittal of guilty persons on account of some nice technical distinction between the offence ’ charged and the offence proved against a person accused of a criminal offence. The crimes of larceny, receiving stolen property knowing it to be stolen, obtaining property by false pretences and embezzlement, are so much alike in many respects and often separated by lines so-indistinct, and almost imaginary, that it wras difficult for the prosecutor, in most cases,to determine, a priori, which particular crime to charge in the indictment, and it very often happened that the proof made out a different crime-from the one charged- in the opinion of the judge who presided at the trial, and the consequence was that the accused had to be acquitted, though in fact guilty of a more aggravated crime than the one charged against him. All who are familiar with the criminal law know this to be the fact, and that it is so may be plainly seen by a cursory view of the cases collected in 2 Russell on Crimes, under the proper heads; and the same may be said of any other treatise on crimes. Row, the legislature of 1847-8, which enacted the “ criminal code,” determined to end this evil by making all these crimes-larceny, and therefore declared that if any person receive stolen property knowing it to be stolen, or embezzle property, or obtain it by false pretences, “he shall be deemed guilty of larceny thereof.” There was nothing incongruous in this, nor is there any danger, as the learned counsel for the accused in this case seems to suppose, that it may take the accused by surprise. The offences are all cognate. They are all offences against property, and^property of which larceny may be com *581 mitted. They differ only in a few circumstantial details, immaterial in a moral point of view. They all amount to a criminal and fraudulent conversion by one man to his own use of another man’s property. Larceny at common law always includes a trespass, and implies that the property was taken invito domino. The other offences named did not include a trespass, and were often committed by the consent of the owner, though fraudulently obtained. The statute merely abolishes these distinctive features, and declares that the offenders shall be deemed guilty of stealing, taking and carrying away the property. There is no danger of surprise. When A is charged with stealing certain property of B, the su bstauce of the charge is the fraudulent conversion of that property by the former to his own use, and whether it was done by meaus of a larceny at common law, or by receiving the property knowing it to have been stolen, or by obtaining it by false pretences, or by embezzling it .after having been entrusted by the owner with its custody, can make no difference in regard to taking the accused by surprise. lie kuows what the law is, and that if it be proved that he effected his criminal object by ■either of the means aforesaid he will be convicted of larceny, and he must be prepared to meet that proof if he can. We know very well that the facts admissible to prove a larceny at common law are often as complicated .as are the facts which constitute any of the other offences .aforesaid, and the objection of surprise might as well be made in that case as in a case arising under the statute.
The learned counsel in his argument spoke of this ■course of legislation as something different from what has ever existed in England. But it singularly happens that the standard English work from which he read most of his law, Roscoe’s Criminal Evidence, page 77, informs us ■.that the 24th and 25th Vict., ch. 96, § 72, provides that *582 “ if, upon the trial of any person indicted for larceny it shall be proved that he took the property in question in any such manner as to amount in law to embezzlement or fraudulent application or disposition, he shall not, by reason thereof, be entitled to be acquitted; but the jury shall be at liberty to return as their verdict that such person is not guilty of larceny, but is guilty of embezzlement or fraudulent application or disposition; and thereupon such person shall be liable to be punished in the same manner as if he had been convicted upon an indictment for such embezzlement or fraudulent application or disposition.” See also id. 405, 564. Surely the accused would be at least as much taken by surprise by a proceeding under this English statute as he would be under our statute before mentioned.
If the true construction of our statute be not as before-stated, what can be its meaning? The learned counsel1 argues that its meaning merely is to make the offencesin question punishable as larceny. How-, if that had been the only meaning, why did not the legislature expressly say, as it might in at least as few words have done, “shall he punished as for the larceny thereof ?” Why, on the contrary, did it say “he shall be deemed guilty of larceny thereof?” — that is, deemed guilty of larceny, not only for the purpose of punishment, but for all purposes. There is no limitation or restriction of the general words-used. ■ This view is confirmed by the phraseology of the-acts referred to in the Session Acts of 1831-32, p, 22, §10, and of 1842-43, p. 58, § 2.
I have said much more on this question, perhaps, than I ought to have done, inasmuch as we are all agreed, at least in this, that the construction of the law for which I contend must now be considered as its settled construction, however the question might be regarded if it were an originaTone. I have done so mainly because the: *583 learned counsel for the accused laid much more stress upon this point in his case than any other, and devoted to it the most of his argument; indeed, his long ing argument was almost exclusively devoted to it. He seemed to have very great confidence in his view. I had another reason for doing so, whieh was perhaps not so good as the former, though it was operative -to some extent with me. It happened that I was a member of the legislature which framed the criminal code, and also of the legislature which enacted the Code of 1849. It also happened that I prepared the opinion of this court in each of the cases of Dowdy, Leftwitch and Price, before referred to. It is not strange, therefore, that I should have a decided view of the question under consideration, or that I should be at least as confident of the correctness of that view as my learned brother, the counsel for the accused, is of the correctness of the opposite view entertained by him. I will now proceed to consider the other questions arising in the cause in the order in which they arise, commencing with the first.
The first error assigned is, the refusal of the court to give the first instruction asked for by the accused. That instruction is in these words:
“ 1. If the jury believe from the evidence that the prisoner had sums of money audited and allowed him by the board of supervisors of Henrico county sufficient to pay all existing legal warrants drawn by him in his own favor, and passed to and owned by other parties, which have been registered on the books of the treasurer of the-county before the warrants said to have been sold to Hr. "White, and also to pay the warrants of Hr. White, then they must acquit the prisoner.”
It appears from the evidence certified in the case, that county levies to a very large amount had been made in the years 1871 and 1872, by the board of supervisors of *584 Henrico comity, in favor and in the name of the accused, William J. Anable, who was clerk of the Comity court, and, ex officio, clerk of the board of supervisors. There had been allowed to him by the board, out of the levy of 1871, the sum of $2,284, of which amount he had drawn the sum of $2,059, leaving due to him of that levy $225; and out of the levy of 1872 the sum of $1,424, none of which, nor of the said balance of $225, making together the sum of $1,649, has been paid; the treasurer of the county having been directed by the board, in consequence of the difficulties arising about the supposed warrants, which will be presently mentioned, not to pay any warrant at all, and 'having declined to do so until the matters vrere adjudicated.
To state intelligibly the question presented by the first instruction, it seems to be proper to notice briefly some of the provisions of the law in regard to the powers and duties of the board of supervisors of a county, and of some of the officers of the board and county. They may be found in two acts in the Session Acts of 1869-70, pp. 257 and 269; one of them being chapter 179, entitled “an act prescribing the duties and compensation of county officers; ” the other being chapter 188, entitled “an act prescribing the duties and compensation of certain township officei’s.” These are the first acts which were passed under the new Constitution, which introduced the present system of county organization. They were in force when the transactions involved in this case occurred, and therefoi’e govern it; though, I believe, the acts now in force on the same subject, being chapters 170 and 230 of the Session Acts of 1871-72, pp. 221 and 290, are to the same effect, in substance at least, so far as concerns this case. My references will be to the former.
Chapter 188, § 3. The board of supervisors of the seve *585 ral counties shall assemble at their respective court-houses . on the first Monday in December m each year, and proceed to discharge the duties hereinafter prescribed.
, , , . . ,. „ § 4. They may also hold special meetings, &c.
§ 5. They shall have power, at the meeting on the first Monday in December in each year, to audit the accounts of the county; to settle with the different county officers, &c.; to fix the county levies for the ensuing year, &c.
§ 6. They, shall have power, at.said meetiug in December or at any other legal meeting, among other things enumerated, to examine, settle and allow all accounts chargeable against such couuty, and when so settled they may issue county warrants therefor, as provided by law. But they shall not issue, in any one year, a greater amount of county warrants than the amount of the county tax levied in such county for such year, &c. They shall represent the couuty and have the care of the county property and the management of the business and concerns of the county in all cases where no other provision shall be made.
§ 8. They shall, at the first meeting after their election, choose one of their number as chairman, who shall preside at such meeting and all other meetings during the year, if present, &c.
§ 9. He shall countersign all county warrants.
§ 10 declares that accounts are to be allowed by the board, and how they are to be made out, and requires the attorney for the Commonwealth to represent the county before the board and resist the allowance of any claim that is unjust, or ought not to be allowed.
§§ 12, 13, 14 and 15 give a right of appeal from the board to the county court, prescribe the duty of the •clerk of the board in such cases, declare when an action may be maintained against a county, and when the determination of the board is to be final, &c.
*586 § 16 directs the books, records and accounts of the hoard to be deposited with their clerk, and to be open,, without any charge, to the examination of all persons-
§ 18 requires the board to have published yearly a full-report of the receipts and expenditures of the year next pi’eceding, and of the accounts allowed, &c.
§ 22 declares that the clerk of the county court shall be, ex officio ‘ clerk of the board of supervisors, and may appoint a deputy, for whose acts the clerk and his sureties shall be responsible under his official bond.
§ 23 presciibes the general duty of such clerk, among; which is the duty to sign all warrants issued by the board for the payment of money, and to record in a book provided for the purpose the reports of the county treasurer of the receipts and disbursements of the county.
§ 25 declares that such clerk shall not sign or issue-any county warrant except upon a recorded vote or resolution of the board of supervisors authorizing the same; and such warrant shall be signed by the clerk and countersigned by the acting chairman of the board;, and the name of the person to whom it is issued shall be entered in a book to be kept by him in his office for that purpose.
Chap. 179, §§ 4-33, relate to the county treasurer, but only a few of these sections need he noticed here.
§ 8. The treasurer shall reside in the county of which-he is treasurer, and shall keep his office at the county-seat, and shall receive all moneys payable into the treasury thereof, and disburse the same on orders of the.County or Circuit court, or warrants drawn by the board, of supervisors for the county; but it shall be competent for the judge of the County court, by order entered of record, to certify that in his opinion some other point in said county would be more convenient to a majority of the citizens of said county; and upon the entry *587 of such order the treasurer for such county shall remove his office to the place named in said order, &c.
§ 9. He shall keep a just account of all moneys received and disbursed by him for the county, and return at intervals of two months, until his settlement with the hoard at the end of the year, sworn statements of his receipts to the clerk of the court, to be preserved by him for the inspection of any person having an interest therein. He shall keep the books, papers and money pertaining to his office at all times ready for the inspection of the county judge or board of supervisors; and shall, when required, exhibit his account and the book containing a list of the warrants and orders drawn upon the county treasurer provided for in the following section.
§ 10. He shall provide and keep a well-bound book, in which he shall make an entry of all warrants or orders legally drawn upon him by the County or Circuit court, or the board of supervisors for the county, and presented for payment, stating correctly the date, amount, number, in whose favor drawn, and the date the same-was presented; and all warrants or orders so presented shall be paid in the order presented, out of the fund drawn upon.
§ 11. Ho county treasurer shall refuse the payment of any warrant or order legally drawn upon him and presented for payment for the reason that warrants or orders of prior presentation have not been paid, when there shall be money in the treasury belonging to the-fund drawn upon sufficient to pay such prior warrants or orders, and also such warrants or orders so presented; hut such treasurer shall, as he shall receive money into-the treasury belonging to the fund so drawn upon, set the same apart for the payment of warrants or orders previously presented, and in the order presented: pro *588 vided, however, that nothing herein contained shall prevent the treasurer from receiving warrants of the county in payment of the county levy.
These sections show how careful the legislature has been to secure the people of a county against the imposition of unjust or improper claims, and to prevent the issuing of illegal, pretended, or fraudulent warrants upon the treasury of a county. And yet the facts certified in the record in this case show, that since the board of supervisors of Henrico county was first organized, in 1870, the board has never, by a recorded vote, authorized the issue of any warrant; but it has always been the custom, sanctioned by the acquiescence of the board, for the chairman and clerk of the board to issue warrants whenever a claim against the county had been audited and allowed by the board. It has been the habit of the chairman to sign his name to blank warrants, and leave them with the clerk of the board, to be filled up and delivered by the clerk to persons entitled thereto; trusting to the clerk to act faithfully in the matter. The record book of the proceedings of the board rvas in possession of the clerk, and he could always see from it what amounts had been allowed. According to this extraordinary and most unwarrantable custom, Samuel L. Anable, the father of the accused, who had been a member of the board ever since it was organized, and was chairman thereof from July 1871 to July 1872, signed, as such chairman, a large number of these blank warrants, how many does hot appear, and placed them in the hands of the accused for the purpose aforesaid. The accused at different times, between the 30th of December 1871 and the 26th of March 1872 inclusive', filled up a large number of these blank rvarrants in his own favor for different amounts, signed them as clerk of the board, and negotiated and effected sales of them through the agency of different *589 persons employed by him for that purpose. The precise amount of these pretended warrants in the aggregate does not appear; but it could not have been less, was probably more, than $3,000. Such warrants, to the amount of $3,064, were actually presented to the treasurer and registered on his book; and others were negotiated and sold by the-accused or his agents, which do not appear ever.to have been presented or registered. One of the said warrants which were registered, amounting to $350, appears to have been afterwards returned to the accused and destroyed by him; in fact appears not to have been actually sold. This amount must therefore be deducted from the list of registered warrants aforesaid; but still the amount of warrants disposed of as aforesaid must have exceeded $3,000.
Thus it appears that the accused, having an interest in the county levy of Henrico county only to the extent of $1,649, and well knowing that that was the full amount of his said interest, and the utmost extent to which he was entitled to receive and have county warrants on the treasurer of said county, yet filled up and signed blank warrants as aforesaid to the amount' of upwards of $3,000, and negotiated and sold them, falsely pretending to the purchasers, or some of them, that he had an interest in the county levy to that extent, and a right to draw on the county treasurer to that amount.
How, it is evident, from this statement of the facts, that a large amount of money, or its equivalent, has been thus obtained by the accused by these false pretences, and the question is, whether the check, the larceny of which is the subject of this accusation, is a part of the subject which was thus obtained.
It does not appear from the record at what precise dates the supposed warrants were negotiated and sold as aforesaid, except that the one for which the check afore *590 said was received was negotiated and sold on tlie 27th of March 1872, the date of the check. The record • shows the dates of the supposed warrants which were registered, the said dates commencing December 30th 1871, and ending March 26th 1872 (by mistake stated in the register as March 22), the last being the date of the supposed warrant sold to Dr. White for the check aforesaid. If the said warrants were sold in the order of their dates, then the one which was sold for the said check was the last one sold, as it bears the last date of all which were sold, whether registered or not. According to this view the said check wTas certainly a part of the subject obtained by false pretences as aforesaid, unless there be something in the order of registration of the supposed warrants which prevents that effect. The registered warrants were not all so registered precisely in the order of their dates. The first eight were, being all the warrants that were registered prior to the one for which the check aforesaid was received. Two warrants are registered below that one, which are shortly prior in date to that one, being dated March 6 and March 16th; while that one is dated March 26th 1872. The warrants which were sold but have not been registered, so far as appears from the record, also bore date before the one for which the said check was received.
But the counsel for the accused insists, that if when the warrant for which the check was given was registered the amount due to the accused on account of the ■county levy was sufficient to cover the amount of all the ■supposed warrants in favor of the accused which had been registered, including the one for which the check was given, then the accused cannot be guilty of obtaining that check by false pretences, and therefore cannot lawfully he convicted of the larceny of the check, even though long before he obtained it he may have sold and *591 assigned his whole claim against the county: and the first instruction asked for by him was intended to embody this as a proposition of law.
I can only say that if this be law, it strikes me as something very strange; for even if we admit the truth •of the fact assumed by the instruction, as to the sufficiency of the amouut of his claim against the county to cover the amouut of warrants registered down to and including the time of registering the one for which the check was given, (which I am not disposed to controvert, and which may be true,) and even if we admit, which I certainly do not admit, that the holders of these supposed warrants were entitled to receive payment of them from the county treasurer in the order of their being registered, until the amount due the accused by the county was exhausted, although before they were drawn he had sold and assigned to others the whole of said amount, still it does not follow that the check in question was not obtained by fraudulent pretences.
Let us suppose that the whole of these warrants, to the amount of upwards of $3,000, had been sold and assigned before any of them were registered, would not the accused have thereby obtained a part of the proceeds of sale by false.pretences? — by falsely pretending that he had in the county treasury enough to pay the whole amount of said warrants, when he knew he had not more than about one-half of that amount in the said treasury? If any part of said proceeds of sale would have been obtained by such pretences, which part would have been so obtained? Certainly that part obtained after he had fully sold and assigned the whole amount of what was due him by the county. Ilis offence would have been complete so soon as he obtained that part or any portion of it; and he might then have been prose- • cuted aud punished for the offence. Can it be possible *592 that this often ce, thus complete, would be purged by having the warrants last sold first registered,supposing such registration loould entitle the holders of them to priority of payment? Or that another offence would thus be substituted for the first? Or that the accused, from having been guilty of obtaining one thing by false pretences, would now become innocent of that offence, and become guilty of another offence, in doing an act which, when done, was innocent? Certainly this cannot be so; and yet it must be so, if the proposition contended for be correct; unless I be very much deceived.
The fallacy of the reasoning in opposition to the view I contend for seems to me to consist in this: that, to-maintain this prosecution, it is necessary to show that Dr. White sustained a loss by the transaction; and as Dr. White, by getting his warrant registered first, will, according to the argument, avoid that loss himself and throw it upon another, therefore this prosecution for obtaining the check from him by false pretences cannot be maintained. With all deference I think this a non seqidtur. A man from whom property is stolen may get it back or recover its value. The thief himself may voluntarily return it. But even that will not purge theoffence when once it has been completed. Dor the same reason, if this offence was complete when the check was received, it does not cease to be an offence, if it can be supposed that Dr. White became entitled to receive the-amount of the warrant assigned to him by having it first registered.
But let me suppose a case for the purpose of illustrating the strange consequence to which the view contended for might lead. Suppose that the county had owed to the accused only $1,000, the whole of which debt he? bona fide, sold to A, filling up a blank warrant and endorsing it to him for the amount; that some time after- *593 wards the accused fraudulently filled up another blank warrant in his own favor for the same amount, and sold it to B, falsely pretending that he -was still a creditor the county to that amount; and that B has his warrant first registered, whereby, according to the view contended for, he becomes entitled to have his warrant paid, and prevents the payment of A’s warrant. How, here is a case in which undoubtedly the accused has obtained §1,000 by false pretences. Suppose he is indicted therefor, and, to avoid all difficulty as to the person from whom the money was thus obtained, the prosecutor, as he may, inserts two counts in the indictment, one for obtaining the money of A, and the other for obtaining it of B by false pretences. Under which of these two counts can the accused be convicted? Certainly not under the first, because he acted bona fide in the sale to A, and there was no criminal intent, which is always necessary to the constitution of a crime. And yet it is contended that he cannot be convicted under the second count, because B has gotten his money, and therefore it is contended could not have been cheated. And thus the accused, by this supposed operation of the law, must go scott free, though all must admit that he has cheated A or B of §1,000 !
But, it is needless to discuss this question further, because it does not arise. Ur. White has not obtained payment of the warrant assigned to him, and non constat that he ever will. In my opinion he certainly never will, if when the supposed warrant was assigned to him the accused had, by prior sales and assignments, entirely exhausted the amount which was due him by the county.
With all due deference to the opinions of those who differ with me, I think the purpose and effect of the registration of these county warrants has been wholly misconceived. The purpose is not to give them effect or make them complete, nor to make them void, even as to *594 subsequent purchasers without notice, unless duly registered. The law in regard to the registration of these warrants is not in that respect like the law in regard to the registry of deeds. The parties entitled to them may or may not, at their pleasure, have them registered, and will be entitled to receive payment of them, whether they be registered or not. The only effect of their not being registered is, that the registered warrants will be first paid, and paid in the order of their registration. The county levy comes into the county treasury by degrees, and there is not enough money there to pay all the warrants at the same time. The money should be applied as received, as far as it will go, and the law directs it to be applied to the payment of the warrants in the order of their registration. This arrangement is made for convenience merely, and the preference which it gives to priority of registration is a mere preference in regard to time and order of payment, and is a reasonable reward to superior diligence. 'Enough money is raised by the county levy for the payment of all the warrants which are drawn upon it. Their payment is a mere question of time, and the order of their payment cannot prevent the ultimate payment of any of them. But these observations apply only to legal and genuine warrants, and not to forged and fabricated ones, which, in fact, are no warrants at all. If the chairman and clerk, or the clerk alone, of the board of supervisors, forge a county warrant, with intent to deceive the county treasurer, which does in fact so far deceive him as to induce him to put it on the register, will anybody contend that payment of such a forged paper can be enforced against the county treasury, even by a bona fide holder for value and without notice? The paper is absolutely null and void, and. never for a moment had any force as a county warrant, and never can have. Now, that is precisely the condi *595 tion of these pretended warrants of the accused, which were issued after he had exhaused, by prior sales and assignments, the whole of his claim against the county.
The law, as we have seen, expressly declares that the clerk shall not sign or issue any county warrant, except upon a recorded vote or resolution of the board of supervisors authorizing the same, and such warrant shall be signed by the clerk and countersigned by the acting chairman of the board, and the name of the person to whom it is issued shall be entered in a book to be kept by him in his office for that purpose. By a very bad custom, the chairman of the board of Henrico has been in the habit of signing blank warrants and trusting them to the clerk, to be filled up, signed by him and issued to the county creditors. Although a bona fide execution of this trust by the clerk (if trust it can be called) would not expose him to the imputation of a criminal offence, however illegal the custom may be, there being no criminal intent in the case, yet certainly he is not authorized to issue a warrant to anybody he pleases, whether a county creditor or not; and if he fraudulently issue a -warrant to a person not a county creditor, with intent to deceive, he is guilty of forgery; and if he obtain money or other valuable thing by means of such a paper, he is guilty of obtaining the same by false pretences, and is by law deemed guilty of the larceny thereof. To fill up, with a fraudulent intent to deceive, such a blank paper, entrusted to him for a different purpose as aforesaid, is as much a forgery as if the whole paper had been forged and fabricated. That the paper in this case was issued to a person who had been a county creditor makes no difference. He had previously sold and assigned to others all that was due him by the county, and was then no longer a county creditor. He stood as if a dollar had never been due him by the county. He knew that such *596 was Ms condition; and knowing that fact, he fraudulently filled up, negotiated and sold this paper, pretending that it was a true and genuine county warrant upon a sure and adequate fund for its payment, and that in due time and in due and regular course of such proceedings, it would certainly be paid by the county treasurer; aud by these means he obtained the check in question. If these be the facts, as the evidence tends to prove them to be, and as they may be consistently with the first instruction ashed for, did he not obtain the check by false pretences? Even if this pretended warrant can ever be of any avail for any purpose, in any future controversy about the fund which was due to the accused out of the county levy, certainly he will have obtained the check by false pretences; for certainly he never would have obtained it if he had not fraudulently misrepresented the facts with intent to deceive. The most that can be said (if that much can be said) of these supposed warrants, or any of them, is, that they, or such of them as were drawn while there was any fund to be drawn upon, may be regarded as equitable assignments, binding in equity the fund onwhich they are drawn in the order. in which they were given. Prior in tempore, prior in jure. But those which were drawn after the fund was exhausted by prior warrants, and when it was well known to the accused to have been so exhausted, are absolutely null and void for any purpose. They are, then, fabrications and forgeries.
In no view of the case therefore did the court err in refusing to give the first instruction.
The second and fourth instructions asked for by the accused were given, and there is of course no question as to them.
The third instruction asked for was also given, but with an addition which was excepted to. I think that addi *597 tion was clearly right, and as we all think so I will say no more on the subject.
The fifth.instruction was refused, and rightly so; but as this is not complained of as an error by the accused, I will take no further notice of it.
The sixth instruction was refused and that is complained of as error. It presents the question whether the check beiug described in the indictment as endorsed by Rewburn, to whose order it was payable, and the evidence being that it was not endorsed by Rewburn when it was handed to him by White, but was so endorsed afterwards; that is a fatal variance.
I do not think it is, for two reasons:
First. The law of larceny does not require a minute •description of the property stolen. The general rule is that it should be described with such a certainty as will enable the jury to decide whether the chattel proved to have been stolen is the very same with that upon which the indictment was founded, and show judicially to the court that it could have been the subject matter of the offence charged, and enable the defendant to plead his acquittal or conviction, to a subsequent indictment relating to the same chattel. 2 Russ. on Crimes, 107. It is .generally sufficient in an indictment to describe a matter made a subject of larceny by statute in the words in which it is described by the statute. Id. 110. To be sure, if an indictment profess to set out a writing in Jiaec verba, it ought generally to be truly set out. But here the check was not intended to be set out, nor was it necessary. It is merely described by certain marks, and the question is, whether the description is sufficient for the purpose of identity, notwithstanding there may have been a misdescription in the respect mentioned. Robody can doubt the fact of identity in this case between the check proved and the check charged to have *598 been stolen. It is described in. the indictment, and truly described, by stating the name of the drawer, the place and time at which it was dated, the bank on which it was drawn, the amount for which it was drawn, the person to whom or to whose order it was made payable, and the person to whom it belonged. It is further described as “ endorsed, Edward B. Newburn.” It appears that this endorsement was not upon the check when it was handed to Newburn by Dr. White, but was put there afterwards. When it was put there, whether in Dr. White’s presence or not, does not appear. It was certainly put there very soon thereafter, and before the money was drawn. It was of necessity put there as a means of getting the money, and Dr. White created that necessity by making the check payable to order. The question then is, whether this is a fatal variance? I think not. I think the maxim here applies “falsa demonstratio non nocet.”
But, secondly, I think there is a better answer still; which is, that Dr. White was not deprived of the title or possession of his property in law by its being stolen from him; that both title and possession continued thereafter in him, so long as it was held by the thief or his agent; that during all that period there was a continual repetition of the larceny, in contemplation of law; that the legal title and possession of Dr. White were not determined by the endorsement of the check by Eewburn; and that, therefore, the check must be deemed to have been stolen, taken and carried away, as well after as before it was endorsed by Eewburn. And so there was no variance.
The only remaining question to be considered in this case, if any, must arise under the second bill of exceptions; which was to the opinion of the court overruling-the motion for a new trial. I have already considered *599 all the questions raised by the counsel of the accused under that bill of exceptions. One or two questions were, however, suggested on the bench, and one of them by myself, in the course of the argument, which ought perhaps to be noticed.
First. It was suggested that the object of the accused was to obtain money, and not a cheek; that he gave no authority to Hewburu to obtain a check; indeed, that he gave no authority at all to Hewburn, to obtain either money or a check; but only gave authority to Quarles to obtain money by a sale of the pretended warrant. To this suggestion the answer is, that the authority given to Quarles, to obtain money by a sale of the warrant, was an authority to sell it and to obtain the money in the usual manner in such cases; and the employment of Newburn as a sub-agent by Quarles, and the receipt of the money by Fewburn, by the means of a check, were within the scope of the power conferred by the accused. If it was larceny to obtain the money, it was equally larceny to obtain the check, which was received as an equivalent for the money, according to the universal custom in such cases, and was the usual and proper means of obtaining the money.
Secondly. It is suggested that the check was not White’s and could not have been recovered by him of Newburn, who at least had a lien upon it for his commission, as also had Quarles. To this suggestion there are several sufficient answers: first, neither of them could have had any claim to commission on a check obtained by them or their principal by false pretences; secondly, even supposing they had such a claim, the general property and right of possession of the check was in White, subject only to a lion or charge for commission, and he could therefore be properly stated as the owner in the indictment; and, thirdly, the Code, ch. 207, § 8, provides that *600 in such a case as this it shall be sufficient to prove that when the offence was committed the actual or contrucpossession, or a general or special property in the whole or any part of the subject of the offence, was in Person alleged in the indictment to be the owner thereof.
Thirdly. It does not certainly appear from the record, in what precise order the supposed warrants were- sold and assigned by the accused; and, therefore, it may not certainly appear that before the check was obtained he had sold and assigned warrants to the full amount of what was due him by the county. I confess I had some doubt at first upon this question; hut, on further reflection, I am decidedly of opinion, that the jury having found a verdict against the accused, with which the court of trial was satisfied, the appellate court ought not to reverse the judgment because the verdict was contrary to evidence in.that respect. All the supposed warrants and the holders of them were before the jury, and nothing would have been easier', I suppose, than to have shown the order in which the sales were made. That the learned counsel of the accused raised no question of that kind, but on the contrary raised the question which his first instruction presents, shows clearly that no such question as the former could be raised on the facts of the case.
Upon the whole I think there is no error in the judgment, and that it ought to be affirmed; but as the other judges think otherwise, it must be revei’sed, and the cause remanded for a new trial to be had thereon.
Anderson and Staples, Js., concurred in the opinion of Christian, J.